UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:16-cr-00102 |
| | ) | Judge Trauger |
| MICHAEL POTEETE | ) | |

## RESPONSE TO MOTION FOR COMPASSIONATE RELEASE

Michael Poteete has filed a motion for compassionate release, under 18 U.S.C. § 3582(c)(1)(A), on the basis of concerns about contracting COVID-19. (DE# 50, Motion.) The government respectfully submits that the motion should be denied.

Although the undersigned is sympathetic to the fact that the defendant is in custody during the COVID-19 pandemic, a reduced time-served sentence would not be appropriate for the following reasons: (1) Poteete's medical conditions do not rise to a level amounting to "extraordinary and compelling reasons" for release, and his conditions appear to be well-managed at Lexington FMC; (2) BOP is taking measures to mitigate the risk to inmates; (3) an analysis of the Section 3553 factors, including the fact that this forty year-old defendant is an Armed Career Criminal with three armed robbery convictions who was on probation at the time of the instant federal firearm offense, supports continued incarceration; and (4) the fact that the defendant has not yet served 50% of his 48-month sentence. Even in light of the COVID-19 pandemic and the fact that the defendant is being housed at a facility with an outbreak of COVID-19 has occurred, upon consideration of all pertinent factors, release is not warranted.

### BACKGROUND

In July, 2015, the Williamson County Sheriff's Office (WCSO) utilized a confidential informant (CI) to proactively assist law enforcement in the investigation of drug and firearm cases

in Williamson County. (PSR, ¶ 4.) The CI advised WCSO that he could facilitate firearm sales with Poteete, who is a convicted felon. (*Id.*)

Poteeete's subsequent sale of a firearm to a WCSO undercover officer (UC) on July 27, 2015, originated from text messages and a recorded phone call between Poteete and the CI earlier that month. (*Id.* at ¶ 5.) On July 20, 2015, Poteete sent text messages to the CI advising the CI that he wanted to "move" a MAC-11 firearm for $600. (*Id.*) Poteete also texted a photo of the gun to the CI. (*Id.*) On July 24, 2015, during a recorded phone call, Poteete and the CI discussed logistics for the gun sale. (*Id.*) Then, on July 26, 2015, Poteete and the CI exchanged additional text messages, and the plan was for the CI to reach out to Poteete the next day to finalize the plan. (*Id.*) Around noon on July 27, 2015, the CI and Poteete finalized the plan for the transaction that was scheduled for later that afternoon. (*Id.*) The two communicated through text messages that the CI would drive over to pick up Poteete at Big Lots and drive Poteete to the buyer, or UC, at a Sonic restaurant where the MAC-11 gun would be exchanged for $600. (*Id.*)

On July 27, 2015, at approximately 4:15 p.m., WCSO deputies met with the CI to arrange for the purchase of the MAC-11 semiautomatic handgun from Poteete. (*Id.* at ¶ 6.) Law enforcement placed an audio recording device on the CI. (*Id.*) A deputy searched the CI's vehicle and then positioned an audio recording device inside the CI's vehicle. (*Id.*)

The CI drove to the Big Lots on Nolensville Road and picked up Poteete, who possessed the MAC-11 firearm. (*Id.* at ¶ 7.) The CI then drove to a Sonic restaurant and arrived around 5:17 p.m. (*Id.*) Law enforcement had set up a close perimeter around the Sonic in order to monitor the expected transaction visually and in real-time audio. (*Id.*)

At approximately 5:19 p.m., a WCSO deputy, who was acting as the UC, or buyer, and who was wired with an audio/video recording device, drove into the Sonic parking lot and parked

beside the CI's vehicle. (*Id*. at ¶ 8.) The UC exited the car, got into the back seat of the CI's car, and introduced himself to Poteete. (*Id*.) At this point, the CI was seated in the driver's seat, Poteete was seated in the front passenger seat, the UC was seated in the rear driver's side, and the MAC-11 firearm was behind the front passenger seat and wrapped in white and brown shipping paper. (*Id*.) Poteete told the UC that he had acquired the weapon from a retired Army Ranger and that it was not stolen. (*Id*.) The UC handed $600 of recorded U.S. currency to Poteete to consummate the transaction. (*Id*.) At around 5:29 p.m., the UC exited the car with the firearm, identified as a SWD, Model M-11/NINE, 9 millimeter caliber pistol, returned to the UC's car, and drove off to meet with law enforcement at a predetermined location. (*Id*.) Contemporaneously, the CI dropped Poteete off at Big Lots and then met up with law enforcement at the predetermined location. (*Id*.)

At the meeting point, a deputy removed the audio device from the CI's car and searched the vehicle with negative results. (*Id*. at ¶ 9.) The firearm was taken back to the WCSO, where it was photographed and logged into evidence. (*Id*.)

Poteete was eventually charged federally in a one-count indictment, alleging possession of a firearm by a convicted felon. (DE# 1, Indictment.) In June 2017, Poteete pleaded guilty pursuant to a sealed plea agreement. (DE# 15, Minute Entry; DE# 17, Sealed Plea Agreement.)

In preparation for sentencing, the U.S. Probation Office prepared a PSR, which found Poteete to be an Armed Career Criminal with a guideline range of 180 months. (PSR, ¶¶ 33, 54.)

The PSR also documented the following criminal history for Poteete: (*Id*. ¶¶ 28-30.)

- On March 19, 1997, he entered a Denny's restaurant, showed the manager a gun, demanded money from the safe, and left with over $300. He subsequently pled guilty to Aggravated Robbery. (*Id*. ¶ 28.)

- On or about March 21, 1997, he entered a McDonald's restaurant and pulled out a handgun and demanded all of the money. The manager opened all three cash drawers, and he left

3

with an undetermined amount of money. He subsequently pled guilty to Aggravated Robbery. (*Id.* ¶ 28.)

- On or about March 24, 1997, he entered the High Note Liquor Store and pointed a handgun at the victim and demanded money. He left the store with over $150 in currency. He subsequently pled guilty to Aggravated Robbery. (*Id.* ¶ 28.)

- On or about November 2, 2007, Poteete was the driver of a vehicle involved in a traffic crash, and he blew a .133 on a breathalyzer test. He subsequently pled guilty to D.U.I. and was placed on probation. (*Id.* ¶ 29.)

- On or about August 12, 2014, Poteete was seated in the driver's seat of a parked vehicle with the keys in the ignition. During an interaction with police, he admitted to drinking beers, and his blood alcohol content was .164. He subsequently pled guilty to D.U.I. on March 2, 2015 and was placed on probation. (*Id.* ¶ 30.) Notably, Poteete was on probation for this D.U.I. conviction when he committed the instant federal firearms offense. (*Id.* ¶ 31.)

On October 23, 2018, this Court sentenced Poteete to 48 months' imprisonment. (DE# 45, Minute Entry; DE# 46, Judgment.)

On May 14, 2020, Poteete filed a motion for compassionate release on the basis of COVID-19. (DE# 50, Motion.) In it, he argues that his medical conditions, when combined with the COVID-19 pandemic, constitute "extraordinary and compelling reasons" warranting such relief. Poteete's current projected release date is May 28, 2022.

## DISCUSSION

### I. Legal Framework

In general, a "court may not modify a term of imprisonment once it has been imposed except" in certain narrow circumstances. 18 U.S.C. § 3582(c). One such circumstance occurs if, after exhausting administrative remedies,[1] a defendant files a motion for compassionate release. A

---

[1] Poteete filed a request with BOP on April 30, 2020, so 30 days have now lapsed since his initial request.

4

court may only grant such a motion, however, if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).[2]

The pertinent policy statement is set forth at U.S.S.G. § 1B1.13. It prohibits courts from reducing a defendant's sentence unless the court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Sentencing Commission also provided explicit examples of what constitutes an "extraordinary and compelling circumstance"[3]:

(A)    **Medical Condition of the Defendant.**—
       (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

       (ii)   The defendant is—

              (I) suffering from a serious physical or medical condition,

---

[2] Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release. Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

[3] While district courts disagree about whether the First Step Act alters the binding nature of U.S.S.G. § 1B1.13, the limited statutory exceptions to the general rule of finality of judgment, and the extraordinary nature of the relief sought, demonstrate that the policy statement remains binding. *See generally Dillon v. United States*, 560 U.S. 817 (2010); *see also United States v. Mollica*, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting cases).

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     **Age of the Defendant.** — The defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C)     **Family Circumstances.** —

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

USSG § 1B1.13 cmt. n.1.[4]

Thus, in order to qualify for compassionate release, after having exhausted administrative remedies, a defendant must be able to demonstrate one of the listed reasons in (A)–(C) above. *See United States v. Shields*, 2019 WL 2645028, at *2 (N.D. Cal. June 27, 2019). As the movant, a defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United*

---

[4] Application Note 1(D), the final example listed by the Sentencing Commission, is inapplicable to this situation. It provides as follows: "**Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." USSG § 1B1.13 cmt. n.1. In turn, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. In this case, there is no need for the Court to rely upon the determination of the Bureau of Prisons on other reasons, since, by thus far denying Defendant's request to make a motion on Defendant's behalf, the Bureau of Prisons has not identified another "extraordinary and compelling reason" under this application note.

*States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020).

As district courts addressing these claims have noted, "[t]o be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)). Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims. *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)); *cf. United States v. Johns*, 2019 WL 2646663, at *2–3 (D. Ariz. June 27, 2019) (granting reduction for 81-year-old defendant with multiple serious medical conditions, including "severe heart disease" and a stroke, from which he is not likely to recover, and, after serving 23 years, had a substantially diminished ability to provide self-care within the BOP).

## II. Poteete Has Not Demonstrated that Compassionate Release Is Warranted.

Poteete has not shown that the extraordinary remedy of compassionate release is warranted for the following four reasons:  First, Poteete has not shown that his medical conditions warrant his release. Second, BOP has been taking the necessary steps to stop the spread of COVID-19. Third, the facts of the case, combined with Poteete's criminal history as an Armed Career Criminal, demonstrate that release is unwarranted in light of his danger to the community and the factors set

forth in 18 U.S.C. § 3553(a). Lastly, the defendant has not yet served half of his 48-month sentence.

## A. Poteete's medical conditions do not constitute "extraordinary and compelling reasons" for release, and his medical conditions appear to be well-managed.

In his motion, Poteete asserts that he has the following medical conditions[5] which necessitate his release from prison: (1) "liver damage;" (2) "a history of heart problems;" and (3) "a current problem with his splenic artery." (DE#50, Motion, PageID#151). Notably, Poteete did not mention any concerns about his liver or his splenic artery when he was interviewed by the presentence report writer in the instant federal firearm case. (PSR, ¶ 43.) As the CDC notes, certain medical conditions "may put people at higher risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. As will be discussed below, however, it is the position of the government that Poteete's stated medical conditions do *not* constitute serious underlying medical conditions that, based on CDC guidelines, would place Poteete at a higher risk for severe illness if he were to contract COVID-19 at his current facility, Lexington, FMC.

First, Poteete's argument that he has "liver damage" is not an "extraordinary and compelling reason" to reduce his sentence. According to the CDC, "[c]hronic liver disease, including cirrhosis, may increase risks for serious illness from COVID-19." (*Id.*) And for those with chronic liver disease, the CDC's recommended course of action is to, "take your medication exactly as prescribed." (*Id.*) From a review of the medical records filed in this case, it does not appear as though Poteete has chronic liver disease. A reading of his March 13, 2019

---

[5] Other physical ailments are mentioned in the defendant's motion at DE# PageID#169. However, defense counsel has advised the undersigned that the conditions of "longstanding hypertension, high cholesterol, and history of heart surgery" are not applicable to Poteete.

8

Gastroenterology clinic consultation revealed that an ultrasound showed a "normal-appearing liver" and no apparent advanced liver disease. (DE#53, Sealed Medical Records, p. 75-76.)

Second, Poteete insists that his "history of heart problems" is another basis to order his immediate release; yet, a close look at the CDC guidelines dispels that notion. According to the CDC, "[s]erious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension, may put people at higher risk for severe illness from COVID-19." And for those with serious heart conditions, the CDC's recommended course of action is to, "take your medication as prescribed." From a review of the medical records filed in this case, it does not appear as though Poteete has a "serious heart condition." The undersigned has reviewed the medical records filed by defense counsel for treatment for chest pains approximately thirteen years ago; but according to the CDC that would not equate with a "serious heart condition." Similarly, although the defendant states in his Motion on PageID#155 that he believes he has been diagnosed with atherosclerosis, a search on WebMD.com indicates that it constitutes "plaque" build-up of the arteries; consequently, the government would argue that atherosclerosis is not a "serious heart condition."

The third medical reason Poteete advances for his time-served sentence is his "current problem with his splenic artery" and a potential effect on his immune system. However, this stated reason lacks merit, as there does not appear to be any evidence that the defendant definitively has a weakened immune system. According to the CDC, "[p]eople with a weakened immune system have reduced ability to fight infectious diseases, including viruses like COVID-19." Additionally, the CDC explains that, "[m]any conditions and treatments can cause a person to have a weakened immune system (immunocompromised) including cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV

9

treatment, and prolonged use of corticosteroids and other immune weakening medications." In this case, the medical records do not establish that Poteete is immunocompromised. An abdominal ultrasound report was generated on February 26, 2019; and the findings were that Poteete's spleen "appear[ed] normal in size and echogenicty." (DE#53, Sealed Medical Records, p. 81.) An evaluation of Poteete's splenic artery was performed on August 6, 2009; and the vascular finding was, "[n]o splenic artery or other aneurysm." (DE#53, Sealed Medical Records, p. 66.)

Given these records, it appears that Poteete has relatively mild versions of the underlying conditions, and that these conditions are being well-managed, in a way that fully complies with the CDC's guidance for COVID-19. Poteete does not suggest otherwise.

**B.      BOP has taken extensive measures to mitigate the risk to inmates.**

Poteete is currently housed at Lexington, FMC. The BOP website shows that 78 inmates are positive for COVID-19, the facility has had five inmate deaths, and 188 inmates have recovered from COVID-19. *See* https://www.bop.gov/coronavirus/ (last viewed June 4, 2020).

It is understandable, therefore, for Poteete to be concerned about the possibility that he might get sick. But BOP has been taking extensive precautions to minimize the risk of COVID-19 transmission into and within its facilities. For example, on March 13, 2010, BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan, which comprises several preventive and mitigation measures, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable. *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, available at

https://www.bop.gov/coronavirus/covid19_status.jsp. All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures.

BOP has continued to implement more stringent protocols as events have unfolded. On March 31, 2020, BOP announced it had ordered implementation of Phase 5 of its COVID-19 Action Plan effective April 1, 2020. Phase 5 provides that "[f]or a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus." *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. On April 13, 2020, BOP implemented Phase 6 of its COVID-19 Action Plan, extending measures from Phase 5 and the extended lockdown until May 18, 2020.

* * *

Taken together, it appears that Poteete has relatively mild and well-managed medical conditions[6]. Under these circumstances, he has not shown that compassionate release is warranted, as other courts have recognized. *United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13.").

To echo the Third Circuit's recent summary, "We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [Poteete]. But the mere

---

[6] The undersigned is certainly not a medical doctor and has attempted to assess the voluminous medical records in relation to the CDC guidelines and 18 U.S.C. Section 3582(c)(1)(A).

11

existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 3, 2020).

## C. The facts and circumstances of this case, including Poteete's criminal history, weight against release.

In addition to considering Poteete's medical conditions, the Court must also consider whether Poteete is a danger to the safety of any other person or the community, and whether the 18 U.S.C. § 3553(a) factors warrant release. *See* U.S.S.G. § 1B1.13; *United States v. Kincaid*, -- F. App'x --, 2020 WL 1951899, at *1-2 (6th Cir. Apr. 23, 2020) (affirming denial of compassionate release for defendant who was terminally ill and not a danger to the community, based on the § 3553(a) factors). Here, those considerations weigh against granting Poteete's motion, although the government does acknowledge that Poteete's three armed robberies occurred many years ago.

The nature and circumstances of the underlying offense here are very serious. Poteete possessed a firearm as a three-time convicted felon, and he proceeded to sell the firearm to an undercover agent. He also committed the offense while being on probation. Poteete is an Armed Career Criminal who perpetrated three distinct armed robberies in March, 1997. The robberies all occurred on different days, and he brandished a gun during each of the three victim-related crimes.

The 48 month sentence this Court imposed also "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Based on the facts of this case, the imposed 48-month sentence reflects the

12

seriousness of the crime, promotes respect for the law, and provides just punishment for this firearm offense.

Granting compassionate release to this defendant who has not yet served half of his sentence would neither "afford adequate deterrence to criminal conduct," nor would it "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B)-(C). In this case, the defendant's continued incarceration is appropriate in order to protect the community from this defendant (specific deterrence) and deter others who are contemplating committing similar crimes (general deterrence). Regarding specific deterrence, the defendant did not sufficiently learn from the mistakes he made earlier on in his life, nor did his prior sentences deter him from further criminal conduct. Furthermore, the fact that he previously received convictions for three violent crimes involving the brandishing of firearms, and that he re-offended with the instant Federal gun offense, illustrates how the defendant simply can not be deterred by means other than a lengthy period of incarceration. A less than two-year custodial sentence in this circumstances, therefore, would not be appropriate.

Admittedly, Poteete's disciplinary record does not show any incidents. But many defendants do well in prison only to revert to crime upon their release, and many older defendants have years of good conduct in prison but may remain dangerous to the community. The standard for compassionate release is not just whether someone has performed well in prison and is of an age where he is statistically less likely to recidivate. *See* U.S.S.G. § 1B1.13 app. note 3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.") Instead, a defendant must show that he will not be a danger if released. Given Poteete's criminal history, including serious violent offenses, he cannot make that showing here. He was previously convicted of perpetrating three

13

extremely serious, victim-related robberies while brandishing a gun; and while on probation for his second D.U.I., he made the choice to once again violate the law and possess and subsequently sell a MAC-11 semiautomatic handgun as a convicted felon. As such, his motion for compassionate release should be denied.[7]

## D. Poteete's request for compassionate release should be denied because he has not yet served a majority of his sentence.

According to the memorandum prepared by U.S. Probation, Poteete self- surrendered to BOP on January 4, 2019 to begin his 48 month sentence; and his current projected release date is not until May 28, 2022. Thus, Poteete has not yet served half of his sentence.

To date, courts have generally granted compassionate release based on the threat of COVID-19 where the inmate suffers from significant ailments, is over 65 years old, is serving a short sentence or has served most of a lengthier one, and/or does not present a danger to the community. *See, e.g.*, *United States v. Ardila*, 2020 WL 2097736 (D. Conn. May 1, 2020) (granting compassionate release for defendant who is "71 years old and suffers from diabetes, cardiovascular disease, hypertension, asthma, and obesity"); *Samy v. United States*, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (granting motion of defendant who is 72 years old and has twelve serious ailments, including uncontrolled hypertension, congestive heart failure, type II diabetes, and asthma); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release to 65-year-old defendant who has 26 days remaining on sentence and "suffers from a host of medical ailments, including chronic obstructive pulmonary

---

[7] If the Court disagrees and chooses to grant Poteete's motion, it should impose a term of supervised release equal to the remainder of the undischarged sentence, with one condition being that Poteete remain on home confinement during that term. *See* 18 U.S.C. § 3582(c)(1)(A). That term would then be followed by the additional term of supervision included in the original judgment. In addition, if the Court grants the motion, it should order a 14-day quarantine period before Poteete's release.

14

disease . . . and asthma").  Here, the fact that Poteete has not yet served 50% of his sentence (in addition to the fact that he is only 40 years old) militates against compassionate release.

**CONCLUSION**

Although COVID-19 is an extraordinary world event that understandably causes grave concern for all inmates, and particularly those with health issues, Poteete has failed to show that its impact on him constitutes "extraordinary and compelling reasons" warranting his immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A). His health issues are being well-managed in custody.  In addition, his criminal history as an Armed Career Criminal, combined with the seriousness of the underlying offense, weigh heavily against release here.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney

By: */s/ Joseph P. Montminy*
Joseph P. Montminy
Assistant United States Attorney
A-961 U.S. Courthouse
Nashville, Tennessee 37203
Telephone:  615-736-5151

15

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 5, 2020, a true and exact copy of this document was sent via the Court's electronic filing system to:

Michael C. Holley
Federal Public Defender's Office
810 Broadway, Suite 200
Nashville, TN 37203

***/s/ Joseph P. Montminy***
Joseph P. Montminy
Assistant United States
